**MYERS INVESTIGATIVE AND SECURITY SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–780C.**

United States Court of Federal Claims.

Aug. 4, 2000.

---

Lawrence Jeffrey Sklute, Washington, D.C., attorney of record for plaintiff.

Sean Curtis Griffin, Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Kirk T. Manhards, Assistant Director.

## ORDER

FUTEY, Judge.

This matter is before the court on defendant's motion to exclude plaintiff's appendix and reference to improper material from consideration and plaintiff's opposition thereto. The United States, through the General Services Administration, Federal Protective Service (hereinafter defendant or GSA), asserts that plaintiff Myers Investigative and Security Services, Inc. (plaintiff) improperly relied upon materials incorporated in the appendix of its cross-motion for summary judgment that are not part of the administrative record. Defendant maintains that the court may not rely upon this material in reviewing GSA's decision. Plaintiff counters that the court may rely upon the extra-record materials because the administrative record is incomplete as filed and does not fully describe GSA's actions during the procurement process.

### Factual Background

This bid protest case involves the award by GSA of two one-year contracts for armed and unarmed guard services on government owned and leased buildings in the state of Ohio. The first contract provides for guard services in northern Ohio (northern procurement), while the second calls for guard services in southern Ohio (southern procurement). Performance on both contracts commenced on October 1, 1999, and shall expire on September 30, 2000.

Prior to October 1, 1999, Allstate Security and Investigative Services, Inc. (Allstate) supplied guard services for all federal buildings in Ohio under a contract with GSA. The second option year of that contract ended on September 30, 1999. Allstate's contract was awarded on a competitive basis under the Small Business Administration's (SBA) 8(a) Program, 15 U.S.C. § 637(a) (1994). The 8(a) Program sets aside contracts for socially or economically disadvantaged contractors. According to Mr. Roger Pinnau, the administrative contracting officer (ACO), Allstate's performance was consistently unsatisfactory under its contract. This unsatisfactory performance led GSA to forgo renewal of All-

state's contract option and to seek to procure guard services under two separate contracts.[1] Mr. Pinnau attested that this division of guard services was necessary because of GSA's planned reorganization of the Federal Protective Service, Great Lakes Region district, which includes Ohio. This reorganization, which began in July 1999, and will become fully effective on October 1, 2000, created five Federal Protective Service, Great Lakes Region districts where four previously existed, and instituted new financing and accounting codes, office symbols and other administrative changes.[2] The reorganization also divided the Federal Protective Service Ohio district into the northern and southern districts, thereby matching the boundaries of the United States district courts in Ohio.

GSA desired to award the two contracts through SBA's 8(a) Program. Mr. Pinnau attested that in order "[t]o determine the feasibility of an 8(a) procurement, [GSA] conducted a market survey to locate responsible 8(a) firms to perform the contract[s]."[3] Although unclear from the administrative record, it appears GSA commenced the market survey as early as February 1999. As part of the market survey, GSA officials contacted "10–15 eligible firms, spoke with current and past contractors, consulted . . . GSA's mailing lists, and asked non–8(a) eligible companies for suggestions."[4] As part of the market survey, GSA submitted to potential contractors a chart that described the category of guard service and included an estimation of hours needed to perform the different categories of work. The chart also included a column for the contractor to provide a price estimate. The potential contractors were asked to submit these price estimates to GSA.

With respect to the northern procurement, Unlimited Security, Inc. (Unlimited) submitted a price estimate of $3,177,556. The administrative record does not specify whether any other companies responded to this market survey.[5] In contrast, at least three companies responded to the southern procurement market survey. Although not part of the administrative record, documents submitted by plaintiff demonstrate that The Diamond Group (Diamond) submitted a price estimate of $2,940,119 on June 2, 1999. On June 7, 1999, Digby's Detective & Security Agency, Inc. (Digby) submitted a price estimate of $3,112,250. The next day, NCLN20 Professional Services (NCLN20) submitted a price estimate amounting to $3,513,810. GSA officials did not contact plaintiff, a small minority business participating in the 8(a) Program, for either procurement despite its having competed for the prior contract.

After receiving these responses, Mr. Pinnau determined that only Unlimited and Diamond expressed a timely interest in performing the contracts. Mr. Pinnau testified that based upon the results of GSA's market survey, GSA explored the possibility of procuring the contracts on a sole source basis.[6] In order to accomplish this, Mr. Pinnau estimated the total value of each contract based upon Allstate's invoices. According to Mr. Pinnau, Allstate charged $3.2 million for fiscal year (FY) 1998, and invoiced approximately $4.2 million for FY 1999. Based upon these figures, he concluded that the two new contracts, each of which covered one-half of Ohio and lasted one year, would be worth less than $3 million each.

### A. Northern Procurement

On May 28, 1999, GSA issued solicitation number GS05P99GCD0002, which sought

1. Aff. of Roger Pinnau, Defendant's Motion for Judgment upon the Administrative Record (Def.'s Mot.), Tab 1, ¶ 5, at 2.

2. *Id.,* ¶ 6, at 2.

3. *Id.,* ¶ 8, at 2.

4. *Id.*

5. Eric–Tek Security Agency, Inc. submitted a price proposal on February 18, 1999, to Arthur Dobbs, the contracting officer. Administrative Record (A.R.), Tab 5, at 11. On April 28, 1999, We're Cleaning, Inc. submitted a letter to Mr. Pinnau discussing the desire of its subsidiary, On Duty Security, to secure a guard service contract with GSA under the 8(a) program. *Id.* at 19. The administrative record does not indicate whether these companies responded to the northern or southern procurement market survey.

6. Aff. of Roger Pinnau, Def.'s Mot., Tab 1, ¶ 12, at 3.

guard services for GSA owned and leased facilities in northern Ohio. The solicitation described the contract as an indefinite delivery, indefinite quantity, fixed price requirements service contract, which would be awarded on a sole source basis. The solicitation also estimated the need for 160,000 guard hours.

By letter dated May 31, 1999, Mr. Pinnau informed Ms. Melinda Edwards of SBA's Office of Program Development of the results of GSA's market survey and its nomination of Unlimited for contract award. Mr. Pinnau recommended that the contract be awarded on a sole source basis, stating that the "anticipated dollar amount ... is estimated at approximately $2.5 million per contract year."[7] On June 9, 1999, SBA, on behalf of Unlimited, accepted GSA's offer for the northern procurement.

On July 9, 1999, Unlimited submitted an offer of $3,287,480 for the 160,000 total estimated hours. On July 15, 1999, Mr. Pinnau issued amendment number seven to the solicitation, which reduced the total estimated guard hours from 160,000 to 146,000, and requested Unlimited to submit a price proposal by July 19, 1999. Unlimited submitted a price proposal of $2,968,140 on July 15, 1999. Incorporated with the proposal was a cover letter addressed to Mr. Pinnau from Mr. Jeffrey Jackson, which stated, in pertinent part:

> I am submitting the second revision of the cost proposal for the Ohio contract. I hope that it meets your concerns pertaining to the $3 million threshold for this contract. This should be considered our best and final offer .... [8]

The contract eventually was awarded to Unlimited.[9]

### B. Southern procurement

On June 15, 1999, GSA issued solicitation number GS05P99GCD0003 directly to Diamond, seeking an indefinite delivery, indefinite quantity, fixed price requirements ser-vice contract for armed and unarmed guard services. The solicitation sought 165,000 guard hours. On July 8, 1999, GSA issued an amendment to the solicitation, which reduced the guard hours from 165,000 to 155,-000, and permitted Diamond to submit another price proposal by July 16, 1999. Diamond submitted a price proposal amounting to $2,987,210 on July 8, 1999.

On July 27, 1999, Mr. Pinnau submitted a letter entitled "Notice of Offer for SBA's Non-competitive 8(a) Program" to Ms. Jennie Montgomery of SBA, in which he recommended that the contract be awarded on a sole source basis to Diamond.[10] Significantly, Mr. Pinnau informed Ms. Montgomery that the anticipated dollar amount was approximately $2.5 million. On August 6, 1999, SBA accepted on behalf of Diamond, GSA's offer for the southern procurement. The contract was awarded to Diamond on September 14, 1999.

Allstate filed a bid protest before the General Accounting Office (GAO) sometime in August 1999. On August 24, 1999, plaintiff learned from Allstate that GSA issued solicitations for the acquisition of guard services to Unlimited and Diamond. On September 2, 1999, plaintiff filed a bid protest before the GAO, alleging that GSA's offering to place the procurements in the 8(a) Program on a sole source, rather than competitive basis, violated several procurement regulations. The GAO dismissed plaintiff's protest after GSA awarded the contracts.

On September 24, 1999, plaintiff filed a complaint together with an application for a temporary restraining order (TRO) and a preliminary injunction, alleging GSA violated procurement statutes and regulations in awarding the contracts, and asserting it would have submitted bids in the two 8(a) procurements if GSA had issued them for competitive, rather than sole source awards. In a hearing held on September 29, 1999, the court denied plaintiff's application for a TRO and preliminary injunction. On December 3, 1999, defendant filed a motion for judgment

---

7. A.R., Tab 5, at 28.

8. *Id.*, Tab 7, at 1.

9. The administrative record does not identify the contract award date.

10. A.R., Tab 5, at 40–42.

upon the administrative record, asserting GSA's decision to award the contracts on a sole source basis was rational. On March 3, 2000, plaintiff filed its cross-motion for summary judgment, asserting GSA's award violated procurement statutes and regulations and was arbitrary and capricious. On April 14, 2000, defendant filed a motion to exclude from consideration the materials incorporated in plaintiff's appendix to its cross-motion for summary judgment, primarily because the majority of these materials were not part of the administrative record filed by GSA. On May 4, 2000, plaintiff filed an opposition to defendant's motion to exclude, requesting that the court deny defendant's motion and consider the materials submitted with its cross-motion for summary judgment.

### Discussion

This court has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (Supp. II 1996). The court reviews challenged agency decisions according to the standards provided in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). The court must determine whether defendant's actions towards plaintiff were:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2).

The current dispute focuses upon whether the court, in reviewing GSA's award of the contracts, may rely upon extra-record materials plaintiff incorporated in the appendix of its cross-motion for summary judgment. Defendant asks the court to exclude plaintiff's appendix, arguing that the court may only rely upon the administrative record. Defendant asserts that if the court finds the administrative record is incomplete or does not adequately explain the GSA's decision, it should remand the administrative record to the GSA for supplementation.

Plaintiff counters that this court permits supplementation of the administrative record in bid protest cases, rather than remanding the record to the administrative agency. Plaintiff essentially contends that the administrative record is incomplete and fails to explain GSA's decision to award the contracts to Diamond and Unlimited on a sole source basis. Plaintiff submitted several documents with its cross-motion for summary judgment which it asks the court to consider in its review of GSA's decision. These documents include affidavits, market research data, and correspondence between the ACO and potential bidders. Plaintiff, however, did not file a motion to supplement the administrative record. Nevertheless, the court *sua sponte* will treat plaintiff's submission of extra-record materials as a motion to supplement the administrative record. Accordingly, the court must addresses plaintiff's motion.

To conduct a review of the agency proceeding under the APA, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Generally, the scope of administrative review is limited to the record developed by the agency. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The court must perform a "thorough, probing, in-depth review" of the agency action. *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. 814. This standard of review is a narrow one, and the court is not empowered to substitute its judgment for that of the agency. *Id.* at 416, 91 S.Ct. 814.

In most bid protest cases, the " 'administrative record' is something of a fiction, and certainly cannot to be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review." *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 345, 349 (1997)

(*Cubic II*). Rather, the agency retroactively creates an administrative record that is filed with the court for review. *See Mike Hooks, Inc. v. United States*, 39 Fed.Cl. 147, 155–56 (1997). As recognized by the court in *Cubic II*, under such circumstances:

> the agency has to exercise some judgment in furnishing the court with the relevant documents. In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery, aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action. It follows that discovery as well as the breadth of the court's review has to be tailored in each case.

*Cubic II*, 37 Fed.Cl. at 350; *see also GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 780 (1997) ("a judge confronted with a bid protest case should not view the administrative record as a immutable boundary that defines the scope of the case"). "[A]llowing the agency to retroactively delineate the scope of review may preclude the 'substantial inquiry' and 'thorough, probing, in-depth review' the court must perform to determine whether the agency's action was arbitrary and capricious." *Mike Hooks*, 39 Fed.Cl. at 156 (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. 814); *cf. Asarco, Inc. v. United States Envtl. Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters").

■ Therefore, in order to preserve meaningful judicial review, the court has permitted the parties to supplement the administrative record in limited circumstances:

(1) when agency action is not adequately explained in the record before the court;
(2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997) (*Cubic I*) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir. 1989) (*Esch*)); *see also Aero Corp., S.A. v. United States*, 38 Fed.Cl. 408, 411 (1997) (applying the *Esch* standard and permitting supplementation); *DGS Contract Serv. v. United States*, 43 Fed.Cl. 227, 235 (1999) (citing *Cubic I* and permitting plaintiff to conduct limited discovery); *Mike Hooks*, 39 Fed.Cl. at 158 (citing *Esch* favorably and permitting supplementation of the administrative record); *GraphicData*, 37 Fed.Cl. at 779 (adopting the *Esch* standard); *Pikes Peak Family Housing, LLC v. United States*, 40 Fed.Cl. 673, 677 (1998) (citing *Esch* and permitting discovery). In light of the forgoing law, the court must determine whether supplementation of the administrative record is appropriate in this case.[11]

A. Affidavits

■ Plaintiff submitted three affidavits with its cross-motion for summary judgment. Tab A contains the affidavit of Mr. Fred Myers, plaintiff's owner and president, dated February 18, 2000. Mr. Meyers attests that neither Mr. Pinnau nor any GSA official contacted him concerning GSA's market survey, and notes that Mr. Pinnau did not attest to having contacted him. Tab Y contains Mr. Pinnau's affidavit, dated September 28, 2000, which explains the basis for GSA's decision. This affidavit is also attached to defendant's

11. Tabs B–E, G, V, W and Z, and Tabs five and six of Tab F, are all excerpts from the administrative record. Therefore, defendant's motion to exclude these documents is denied. Tab BB contains an excerpt from the hearing held by the court on September 29, 1999. The court will not treat this tab as part of the administrative record.

motion for judgment upon the administrative record.

Tab F includes, among other things, the affidavit of Ms. Sandra Dickey, the individual who prepared Diamond's price estimate for GSA's market survey. Ms. Dickey testifies to the events which allegedly transpired at a pre-proposal meeting held between GSA and Diamond on June 24, 1999. According to Ms. Dickey, Mr. Pinnau "stated that he needed to keep the procurement award below 3 million dollars because otherwise he would not be allowed to sole source it." [12] She also testified that Mr. Pinnau and the Regional Security Director "both stated a couple of times that the Diamond Group should not look at this procurement as a one-year requirement but rather to consider it a long-term relationship that they would continue to sole source to the Diamond Group for many years to come." [13] Ms. Dickey also states that Mr. Pinnau provided Diamond two separate market surveys for the southern procurement, the second one containing a significant reduction in estimated guard hours.

Each of these affidavits describes specific events which transpired in the procurement process that are relevant to the agency's decision. For example, Mr. Myers' affidavit explains that plaintiff did not express an interest in the contracts because it was not contacted by GSA. Mr. Pinnau's affidavit explains GSA's decision-making process, which is not readily discernable from the administrative record. Ms. Dickey's affidavit describes a meeting GSA held with Diamond which the record alludes to but provides no contemporaneous account. In addition, although Mr. Pinnau asserts that Diamond responded to GSA's market survey, Diamond's price estimate is not included within the administrative record. In fact, Mr. Pinnau does not mention that he sent a second market survey to Diamond. Further, his affidavit makes no mention of a pre-proposal meeting that was referenced in the solicitation and held with Diamond. Accordingly, the court will consider these affidavits as evidence supplementing the administrative rec-

ord. *See Mike Hooks,* 39 Fed.Cl. at 158 (permitting plaintiff to supplement the record with three affidavits which "discuss factors which the [Army Corps of Engineers] ... should have considered but did not") (citing *Esch,* 876 F.2d at 991). Consequently, defendant's motion to exclude these Tabs from consideration is denied.

█ Defendant, however, also seeks to exclude Ms. Dickey's affidavit on the ground that it consists "entirely of inadmissible hearsay ..." [14] Hearsay is defined as a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). A statement is not hearsay, however, if it "is offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...." FED. R. EVID. 801(d)(2)(D). The court finds that Mr. Pinnau's statements concern matters within the scope of his employment as ACO, and therefore constitute admissions. *See Clark v. United States,* 8 Cl.Ct. 649, 651 n. 1 (1985) ("statements of United States government officials concerning a matter within the scope of their employment are not hearsay"). Defendant did not submit any affidavits or documents contesting Ms. Dickey's account of the pre-proposal conference. Thus, the court holds that the statements made by Mr. Pinnau and incorporated in Ms. Dickey's affidavit are admissible.

## B. Documents

█ Tab F includes seven tabs of material filed in support of Ms. Dickey's affidavit. Tab two includes the market research sent by Mr. Pinnau to Diamond which lists 200,-000 guard hours. Tab three contains GSA's second market survey sent to Diamond which lists 165,000 guard hours and contains Mr. Pinnau's signature. It also includes Diamond's price proposal. Tab four contains a draft solicitation sent to Diamond that is

---

**12.** Aff. of Sandra Dickey, Pl.'s Mot, Tab F, ¶ 8B, at 3.

**13.** *Id.,* ¶ 8E.

**14.** Defendant's Motion to Exclude at 6.

signed by Mr. Pinnau. Tab five includes a letter from Ms. Jeannette Diamond, President of Diamond, to Mr. Pinnau, in which she discusses a change to a price proposal Diamond submitted to GSA in response to a market survey. In his affidavit, Mr. Pinnau attests that GSA relied upon the results of its market survey to consider procuring the contracts on a sole source basis.[15] Because GSA relied upon this information in making its final decision but failed to include it within the administrative record, the court will consider these documents as evidence supplementing the administrative record. *See Esch*, 876 F.2d at 991 (supplementation of the administrative record permitted "when an agency considered evidence which it failed to include in the record"). Accordingly, defendant's motion to exclude Tabs two, three, four and seven of Tab F is denied.[16]

■ Tab H contains a July 1, 1997 memorandum from Mr. Pinnau to Mr. Art Dobbs, the contracting officer, which discusses GSA's receipt of sixteen sealed bids from contractors in response to GSA's Invitation for Bids for the previous contract. Plaintiff contends that Mr. Pinnau allegedly contacted only two of the sixteen companies incorporated in Tab H. Tab K contains several documents which plaintiff obtained from the SBA Internet web site, which demonstrate that eight companies which bid on the prior contract were 8(a) certified. While it is clear that GSA had access to this information, the record does not identify all the 8(a) certified companies Mr. Pinnau contacted or could have contacted. Therefore, the court will allow plaintiff to supplement the record with this information. *See Esch*, 876 F.2d at 991 (permitting supplementation where "the agency failed to consider factors which are relevant to its final decision"). Thus, defendant's motion to exclude these tabs is denied.

■ Exhibit L is a four-page printout from the same SBA Internet web site which

discusses the 8(a) certification status of Diamond, NCLN20, and We're Cleaning, Inc., all of which responded to GSA's market survey. Significantly, this evidence demonstrates that Diamond did not become 8(a) certified until July 15, 1999. Clearly, the 8(a) certification status of these companies was relevant to GSA's decision because it only sought to award the contract to companies which were 8(a) certified. Nevertheless, Mr. Pinnau attested that GSA contacted 8(a) certified and non 8(a) certified firms. The record does not directly address which companies listed are 8(a) certified and which are not. Accordingly, the court holds that Tab L will be considered as part of the administrative record. *See Esch*, 876 F.2d at 991.

■ Tabs I, J, M, N, and AA all relate to GSA's prior contract with Allstate. Tabs I and J each include a one-page excerpt from GSA's contract with Allstate. Tabs one and two of Tabs M and N contain purchase orders sent from GSA to Allstate. These documents are backup information to a chart included within the administrative record. Tab AA includes modification documents pertaining to Allstate's contract. Additionally, Tabs two through eight of defendant's appendix to its motion for judgment upon the administrative record incorporate materials which discuss Allstate's performance under the prior contract. Tab 18 of defendant's appendix includes Allstate's GSA certified invoices.

In his affidavit, Mr. Pinnau describes Allstate's performance as poor and unacceptable, leading GSA ultimately to procure two guard service contracts. The administrative record, however, does not contain Allstate's contract, the invoices it sent to GSA, or documents describing Allstate's performance. Because Allstate's performance was part of GSA's overall decision to procure two guard contracts, the court will treat plaintiff's Tabs

---

**15.** *See* Aff. of Roger Pinnau, Def.'s Mot., Tab 1, ¶ 2, at 3.

**16.** Tab one contains Ms. Dickey's phone records, which are provided to support her assertion that she told Mr. Pinnau on June 2, 1999, that Diamond could not perform 200,000 guard hours for less than $3 million. As mentioned, the contracting officer did not mention this conversation in

his affidavit, and the administrative record contains no memorandum of that conversation. Clearly, these documents did not exist at the time the agency made its decision and are not entirely relevant to the agency's decision. Consequently, the court grants defendant's motion to exclude Tab one of Tab F.

I, J, M, N, and AA, as well as defendant's Tabs two through eight and eighteen, as evidence supplementing the administrative record. *See Esch,* 876 F.2d at 991.

Page one of Tabs M and N each contain a chart comparing section J–1 of the two solicitations with GSA purchase orders from its contract with Allstate. Tabs O and P contain charts that compare guard post hours and locations covered by Allstate's contract with those covered by the contracts at issue. The charts attempt to demonstrate that certain guard post hours covered by the contract with Allstate are not accounted for by the two contracts. Tabs Q and R contain charts which compare the counties covered by the current contracts with the counties reflected in GSA's purchase orders from the prior contract. Tabs S and T include a list of federal buildings allegedly covered by the two contracts that are not included in Allstate's invoices. Tab U contains a two-page chart which breaks down Allstate's FY 1998 and FY 1999 invoices by month, invoice number and amount. The chart calculates the total invoice amount for each year.

The court notes that each of these documents lacks information describing their origin. They do not appear to have been generated by GSA or Allstate. In addition, plaintiff has not alleged that these charts existed at the time GSA made its decision. It appears plaintiff created these documents for purposes of litigation. Under the circumstances, the court finds plaintiff has failed to articulate under *Esch* a basis for supplementing the administrative record with these materials. Therefore, the court grants defendant's motion to exclude page one of Tab M, page one of Tab N, and Tabs O through U.

Plaintiff asks the court to take judicial notice of the materials located in Tabs two through six of its opposition to defendant's motion to exclude. Tabs two and three contain information obtained through the Social Security Administration (SSA) which lists the addresses of SSA buildings in Ohio. Tab four contains information which plaintiff obtained from the SSA Internet web site which includes, among other things, maps and addresses of SSA buildings in Ohio. Tab five contains a facsimile copy of a list of addresses for Department of Veterans Affairs (DVA) buildings located in Ohio which plaintiff obtained from the DVA. Tab six contains a lists of all the federal buildings located within Ohio. Plaintiff asks the court to take judicial notice of the information contained within these documents.

Under the Federal Rules of Evidence, the court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). "In order for a fact to judicially noticed under this rule, 'indisputability is a prerequisite.'" *Murakami v. United States,* 46 Fed.Cl. 731, 739 (2000) (quoting *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354 (7th Cir.1995)). The court may take judicial notice of a fact at any stage of the proceeding. FED. R. EVID. 201(f).

Information concerning all the addresses of SSA buildings, DVA buildings, and all other federal buildings located in Ohio is the type of fact of which the court may take judicial notice. Such information is capable of accurate and ready determination, thereby satisfying Federal Rule of Evidence 201(b). Accordingly, the court will take judicial notice of the information contained in Tabs two through six of plaintiff's opposition to defendant's motion to exclude.

Tab X of plaintiff's cross-motion for summary judgment contains the "Contracting Officer's Statement of Fact and Position" filed in Allstate's protest before the GAO of GSA's decision. In essence, this document is part of the agency's report filed with GSA pursuant to 31 U.S.C. § 3556. Paragraph 17 of General Order Number 38 of the United States Court of Federal Claims includes a list of "core documents" relevant to a bid protest. Subsection (u) includes as a core document "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement." Clearly, the agen-

cy report filed in Allstate's protest before the GAO falls within this category. Because the agency report is a core document omitted from the record, and in light of the fact that both parties cite to this document in support of their motions for judgment upon the administrative record, the court will treat this information as evidence supplementing the administrative record.

### Conclusion

Based upon the forgoing, the court denies defendant's motion to exclude Tabs A through E, Tabs two through seven of Tab F (including Ms. Dickey's affidavit), Tabs G through L, Tabs one and two of Tabs M and N, and X through AA. The court grants defendant's motion with respect to Tab one of Tab F, page one of Tab M, page one of Tab N, and Tabs O through U. The court grants plaintiff's motion to take judicial notice of Tabs two through six of plaintiff's opposition to defendant's motion to exclude. Further, the court will treat Tabs two through eight and Tab eighteen of defendant's motion for judgment upon the administrative record as evidence supplementing the administrative record.

IT IS SO ORDERED.